Steven M. Nuñez, Esq. (185421)
**SMN Law Group APC**
237 A St., PMB 47910
San Diego, California 92101-4003
Telephone:     (619) 296-8400
steve@smnlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TU LE, an individual; GENEVA NGUYEN, an individual; MAI T. LY, an individual, on behalf of themselves and a class of all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>PRESTIGE COMMUNITY CREDIT UNION, a national credit union; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**Demand for Jury Trial**<br><br>**Counts:**<br>**1. Aiding and Abetting Fraud;**<br>**2. Aiding and Abetting Breach of Fiduciary Duty;**<br>**3. Violation of California Penal Code §496;**<br>**4. Financial Elder Abuse** |

Plaintiffs, Tu Le, Geneva Nguyen, and Mai T. Ly, in their individual and representative capacities, and on behalf of a class of all similarly situated victims, by and through their undersigned attorneys allege as follows:

## INTRODUCTION

1. This action concerns a multi-million dollar Ponzi scheme perpetrated by third parties Kent R.E. Whitney and the companies he controlled, the Church for the Healthy Self also known as the CHS Trust, and CHS Asset Management, Inc., (collectively "the Church Companies"). Whitney served approximately 30 months in prison for a prior financial fraud conviction, but aimed to create the Church Companies as fraudulent entities to perpetrate the Whitney Ponzi scheme targeting Vietnamese-American communities in Southern and Northern California.

Class Action Complaint

2. Defendant PRESTIGE COMMUNITY CREDIT UNION ("PRESTIGE") knew of Whitney's prior financial fraud conviction. Nonetheless, PRESTIGE served as the primary bank for the Whitney Ponzi scheme for its entire 4-year existence. PRESTIGE allowed Whitney to deposit investor funds from California through its Shared Branches, receive investor wire transfers, comingle investor funds and facilitate payment of fictitious profits using investor funds. PRESTIGE restricted Whitney's ability to be a signatory on the accounts, but allowed him full access through the Church Companies to commit his fraud. In other words, PRESTIGE tried to protect itself by seemingly distancing the accounts from Whitney, but facilitated Whitney's ability to prey on the Ponzi scheme victims through the Church Companies.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and 1332(d), because there are more than 100 class members nationwide, at least one class member is of diverse citizenship from one Defendant, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs. Plaintiffs and PRESTIGE are also citizens of different states with a matter in controversy exceeding $75,000.

4. Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this judicial district and, a substantial number of victims may be found within this judicial district. That venue is proper in this jurisdiction is confirmed by the fact that the Securities and Exchange Commission ("SEC") has brought an action against the Church Companies and Whitney in this judicial district.

5. Under Federal Rule of Civil Procedure 4(k)(1)(a) and California's long arm statute, Code of Civil Procedure § 410.10, this Court has personal jurisdiction over PRESTIGE. Even though it is based in Dallas, Texas PRESTIGE maintained a contractual relationship with a California-based company called the CO-OP Network for the express purpose of servicing and maintaining PRESTIGE'S clients in California through a Shared Branch network. Therefore, PRESTIGE availed itself of the privilege of conducting business in, soliciting clients from, and operating withing the State of California. Fully aware that Whitney and the Church Companies operated in California, PRESTIGE also processed thousands of deposits, checks, and wire transfers

for the Church Companies in California. PRESTIGE also regularly communicated with the Church Companies representatives, who it knew were located in California. As a result, this suit arises out of PRESTIGE'S regular and significant contacts with California citizens through, among other things, its Shared Branch network.

## PARTIES

6. Plaintiff TU LE is an individual who resides in San Jose, California. At all relevant times, MR. LE was over the age of 65 and an elder as defined by the California Welfare and Institutions Code § 15610.27.

7. Plaintiff GENEVA NGUYEN is an individual who resides in Orange County, California.

8. Plaintiff MAI T. LY is an individual who resides in San Jose, California.

9. Defendant PRESTIGE COMMUNITY CREDIT UNION ("PRESTIGE"), is a Texas Non-Profit Cooperative Association with its principal place of business in Dallas, Texas.

10. Defendants DOES 1 through 10, inclusive, whether individual, corporate, associate, alter ego, or otherwise, are fictitious names of Defendants whose true names and capacities, at this time, are unknown to Plaintiffs. Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, each Defendant sued as a DOE was acting for itself or its agent, servant, employee, and/or alter ego of its Co-Defendants, and in doing the things hereinafter mentioned, was acting in the course and scope of its authority as such agent, servant, employee, and/or alter-ego, and with the permission and consent of its Co-Defendants; and that each of said fictitiously named Defendants, whether acting for itself or as agents, corporations, associations, or otherwise, is in some way liable or responsible to Plaintiffs on the facts hereinafter alleged, and caused injuries and damages proximately, as alleged, and at such times as Defendants' true names and capacities become known to Plaintiffs, Plaintiffs will ask leave of this court to amend this Complaint to insert said true names and capacities.

11. On information and belief, Plaintiffs allege that at all relevant times, Defendant PRESTIGE and DOES 1 through 10, inclusive, and each of them, were acting as agents, servants, alter egos, and employees of each other, and were acting within the full course and scope of their

agency, service as servants, and employment, with the full knowledge and consent, either expressed or implied, of either of the other Defendants and DOES 1 through 10, inclusive, and each of them. (Defendants and DOES 1-10, inclusive, and each of them are collectively referred to herein as "Defendants").

12. On information and belief, Plaintiffs allege that at all relevant times, Defendants and each of them were and are inadequately capitalized and have no genuine or separate existence, but were and are used and are existing for the sole purpose of permitting the other Defendants to transact a portion of their business under a separate guise.

13. At all relevant times, Defendants and each of them completely controlled, dominated, managed, and operated the other Defendants and intermingled their assets with the assets owned by the other Defendants to suit their convenience, such that the individuality or separateness of the Defendants did not exist.

14. The acts of Defendants and each of them were and are the acts of the other Defendants.

15. Failure to pierce the corporate veil would promote injustice and, based thereon, Defendants and each of them are jointly and severally liable with the other Defendants.

**FACTS**

16. The Whitney Ponzi scheme targeted members of the Vietnamese-American communities in Orange County and San Jose for approximately five years until the SEC shut it down on March 13, 2019.

17. The Ponzi scheme, perpetrated through the Church Companies, was the brain child of Whitney, a convicted felon.

18. Whitney was a fraudster long before he became a pastor and founded the Church Companies to perpetrate the Whitney Ponzi scheme. On August 29, 2003 Whitney registered with the Commodity Futures Trading Commission ("the Commission") as a floor broker. From May 2008 through April 2010, Whitney engaged in a scheme to avoid posting more than $96 million of margin calls when placing orders for commodity options traded on the New York Mercantile Exchange and the Chicago Mercantile Exchange. The Commission sued Whitney on December 10,

2010, and obtained a consent order against him on May 22, 2012, permanently barring him from the commodities industry and imposing a $600,000 civil penalty.

19. In September 2011, Whitney pled guilty to one count of wire fraud in connection with the margin call fraud scheme. See *United States v. Whitney*, Case No. a:11-cr-108 (N.D. Ill.). As part of his plea, Whitney admitted to obtaining more than $600,000 from approximately 10 investors for a purported commodity pool investment and for trading in futures accounts to be held jointly between Whitney and the investors. Misrepresenting the use of investor funds, investor returns, and investment risk, Whitney misappropriated most of the money he received, generated bogus account statements, and made Ponzi payments. On December 8, 2011, Whitney was sentenced to 44 months of imprisonment but was released from federal custody in June 2014, after serving approximately 30 months.

20. Within two months of leaving prison, in August 2014, Whitney became an ordained minister through an on-line program. A month later, Whitney formed the Church for the Healthy Self, purportedly as a non-profit, religious organization. It's websites provided the façade of a "virtual church." For example, they provided links to YouTube channels offering religious videos and online prayer requests forms. But it did not hold religious services typically associated with churches. The primary mission of the Church for the Healthy Self was obtaining investor funds.

21. The Church Companies mass marketed a so-called CHS Trust investment program to the public on its websites, including churchforthehearltyself.com, heavily advertising the investment program on Vietnamese radio and television stations in Orange County, California. One such television commercial, in Vietnamese with English subtitles, stated: "Hello, I would like to introduce you to an investment program earning 12% interest from CHS Trust. Safe, effective, and insured by FDIC and SIPC. CHS Trust investment program gives you higher interest than 401K or IRA with maximum tax benefits. Register for a free seminar to learn about the 12% interest rate program at CHS Trust every Wednesday at 6 p.m."

22. The Church Companies were able to solicit more than $33 million from victims of the Whitney Ponzi scheme between 2014 and 2019.

23. On March 13, 2019, the SEC shut down the Whitney Ponzi scheme by filing a civil

action in this judicial district titled *Securities and Exchange Commission v. Kent R.E. Whitney, David Lee Parish, The Church for the Healthy Self a/k/a CHS Trust, and CHS Asset Management, Inc.*, C.D. Cal. Case No. 8:19-CV-499-JVS-KES (Hon. James V. Selna presiding).

24. On March 14, 2019, the Court issued a Temporary Restraining Order appointing a Receiver over the Church Companies.

25. On June 20, 2019, Whitney consented to partial judgment in the matter.

26. On April 15, 2020, Whitney pled guilty to mail fraud in a criminal action titled *United States of America v. Kent R.E. Whitney*, Case No. 8:20-cr-00052-JLS. As part of the plea Whitney admitted to the following facts:

> (a) Beginning in or about September 2014 and continuing to April 4, 2019, Whitney engaged in a scheme to defraud investors through the Church for the Healthy Self (the Church), with related entity CHS Asset Management, Inc. ("CHS Asset") (collectively the "Church Companies") and related entities. The Church for the Healthy Self is a Texas non-profit corporation formed on September 11, 2014. CHS Asset, is a Texas for-profit corporation formed on September 20, 2017. The Church was founded and operated by Whitney out of a strip mall in Westminster, California and Whitney claimed to be the Church's pastor. At Whitney's direction, the Church Companies' representatives appeared on television and in live seminars at the Church's offices soliciting investments in CHS Trust, the Church's investment. In these appearances, the Church Companies' representatives made the following claims: (1) that CHS Trust guaranteed an annual rate of return of 12%; (2) that return of principal was guaranteed with no risk because the investments were backed by the Federal Deposit Insurance Corporation and Securities Investor Protection Program; (3) that in the past five years the worst return the Church Companies realized was a 1.5% profit for the month of January 2015; (4) that the traders used by the Church Companies had not lost money in 15 years; and (5) that the Church Companies were audited by

        KPMG. Recordings of Church representatives' appearances making these claims at Whitney's direction were often uploaded to YouTube for additional exposure.

    (b) At the time these statements were made, Whitney knew they were false or misleading. In reality, the Church Companies did not produce a 12% annual return. Rather, despite millions of dollars deposited from so called investors, little investor money went into any trading accounts in 2018. Because, CHS Asset was not formed until 2017, the statements regarding the investment's performance over the past five years and fifteen years were misleading. Nor were the Church Companies audited by KPMG.

    (c) In reliance on the false statements made by the Church's representatives during television appearances, live seminars, sales calls, and YouTube recordings, victims sent more than $33 million to the Church Companies from 2014 to 2019. As part of the scheme, Whitney directed that monthly statements of account be sent to victims that contained false reports of investment returns to lull victims into believing their money had been invested and was generating returns consistent with the claims made by the Church Companies' representatives.

### Prestige Community Credit Union

27. The Church for the Healthy Self scheme used its accounts at PRESTIGE to scam victims of millions of dollars.

28. On September 29 2014, Whitney and his cohorts opened a bank account with PRESTIGE.

29. As part of PRESTIGE'S account opening procedures, it discovered that Whitney had just been released from prison for a conviction for financial fraud. PRESTIGE refused to allow Whitney to be a signatory on the bank account due to his prior conviction. However, PRESTIGE allowed the Church to open a bank account and start a banking relationship, allowing other officers of the Church to be signatories on the account. Afterward, a PRESTIGE Branch Manager informed

Whitney and his cohorts that he would be removed from the account and physically crossed out Whitney's name and signature from the account opening documents. Attached here as **Exhibit A** is a copy of the PRESTIGE Business Account Information card containing the interlineation of Whitney's signature and information. Next to Whitney's crossed out name and signature is the notation "not on account."

30. As part of PRESTIGE'S account opening procedures, it obtained the Texas Certificate of Filing for the Church for the Healthy Self dated September 4, 2014, Certificate of Formation Nonprofit Corporation for the Church dated September 11, 2014, and By Laws for the Church stating the website and physical address, among other things. These documents as well as PRESTIGE'S Business Account Information made clear that Whitney was the president and pastor of the Church.

31. PRESTIGE obtained a copy of the Church By Laws during account opening, which listed its website on the first page.

32. On information and belief Plaintiffs allege that the Church website stated that the CHS Trust was a church charity and through it, individuals could "Actively engage in philanthropy and support qualified charitable organizations." The website also stated that the Church provides financial services to help grow the equities in trust.

33. On information and belief Plaintiffs allege that by virtue of its account opening procedures PRESTIGE visited the Church website.

34. On information and belief Plaintiffs allege that by virtue of visiting the Church website, PRESTIGE learned at or near the time of account opening that the Church offered investments, namely CHS Trust.

35. PRESTIGE allowed the Church to utilize its California Shared Branches to deposit millions of dollars from investment victims. Many of the deposits consisted of checks from individuals in amounts ranging from $400 to $250,000, with notations in the memo lines such as "initial investment," "investment" or something indicative of the fact that it was intended as an investment. For just the period from January 2018 to February 2019, CHS deposited approximately $25 million of investor funds into the Prestige account utilizing California Shared Branches.

36. The Church began utilizing PRESTIGE Shared Branch locations in California to deposit investor victims' funds in 2015.

37. In 2018 alone there were 220 deposits for a total amount of more than $18,500,000, made at Shared Branch locations in Orange County and San Jose, California.

38. Virtually none of the deposits made to the Church's PRESTIGE account even resembled funds made through investment activity.

39. The rapid increase of the deposits did not resemble church donations either.

40. On information and belief Plaintiffs allege that PRESTIGE reviewed these deposits as part of its hold review policy.

41. PRESTIGE bank records show that ACH payments were continually made to the American Express, Barclay credit card, Credit One card, and PayPal accounts of Whitney.

42. PRESTIGE exchanged numerous emails with Church Company employees, which confirmed that the Church was purporting to conduct financial services in California.

43. On information and belief Plaintiffs allege that PRESTIGE, as legally required, conducted "due diligence" on the Church familiarizing itself with Whitney, the nature of the Church Companies' operations, the source and legitimacy of the funds, and the purpose of the bank accounts as well as monitoring the accounts for red flags indicative of potential financial fraud.

44. By conducting its ordinary procedures, PRESTIGE learned that the Church purported to provide investment services through its CHS Trust and learned that the enormous amounts of deposits were not going toward investments, but instead to pay Whitney's personal bills and payouts to other investors.

45. At no time did Whitney inform Plaintiffs that he had prior convictions for financial fraud. Nor did Whitney inform the plaintiffs that money from investors was virtually the sole source of funding earlier investor returns. Nor did Whitney inform plaintiffs that he was using their funds to pay his personal expenses.

46. As a direct and proximate result of the fraudulent scheme alleged herein, the Plaintiffs reasonably relied on the misrepresentations made by Whitney and invested in his offering. With the aid and assistance of PRESTIGE, Whitney maintained an empty shell banking operation

which in turn allowed Whitney to fraudulently sell non-existent investments and to perpetuate the Ponzi scheme to the benefit of PRESTIGE and the detriment of the investors, including Plaintiffs. Plaintiffs ultimately lost a substantial portion or all of their investment.

## CLASS ALLEGATIONS

47. Plaintiffs, TU LE, GENEVA NGUYEN, and MAI T. LY bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class who are similarly situated and who fall within the following class definitions:

(1) All individuals or entities who invested and lost money with any of the Church Companies. For purposes of this class definition, an individual or entity lost money only if the amount of money that the individual or entity received from the Church Companies, including any return on investment, commissions, fees or any other payments, was less than the amount of the individual's or entity's money invested with the Church Companies. Excluded from the Class are governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, the Defendants, along with their respective parents, subsidiaries and/or affiliates. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

(2) All individuals who meet the definition above and who were residents of California and 65 years of age or older at the time of their investments. (hereinafter "Elder Subclass")

48. Plaintiff TU LE fits within the definition of an Elder Subclass Member. MR. LE was lured into investing in the Church Companies. In February of 2018, he and his wife invested $110,551.22, which was deposited into or transferred to the Church's account at PRESTIGE. On March 6, 2019, MR. LE and his wife invested an additional $204,478.64, which was deposited into or transferred to the Church's account at PRESTIGE. At all relevant times, MR. LE was a California resident and over the age of 65.

49. Plaintiff GENEVA NGUYEN fits within the definition of a Class Member. MS. NGUYEN was lured into investing in Church Companies. On June 20, 2018, MS. NGUYEN invested $10,000.00, which was deposited into or transferred to the Church's account at PRESTIGE. .

50. Plaintiff MAI T. LY fits within the definition of a Class Member. MS. LY was lured into investing in the Church Companies. On July 1, 2017, MS. LY invested $50,000, which was deposited into or transferred to the Church's account at PRESTIGE. On September 21, 2018, MS. LY invested an additional $30,000, which was deposited into or transferred to the Church's account at PRESTIGE.

51. Plaintiffs do not know the exact size of the class. However, Plaintiffs believe that the number is so numerous that joinder is impracticable. Plaintiffs do note that the Receiver has determined that there are over 500 victim/investors.

52. The claims of Representative Plaintiffs are typical of the claims of the class and subclass in that Plaintiffs sent money to be invested in the Church Companies. Indeed, Representative Plaintiffs' investments were in all relevant respects typical of investments by other class members, and the monetary damages and injunctive relief sought is common to the class and subclass.

53. Representative Plaintiffs will fairly and adequately protect the interest of the class and subclass in that Representative Plaintiffs, have no conflicts with any other members of the class and subclass, and are represented by experienced and able counsel. The Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the class and subclass members.

54. Numerous questions of law and fact are common to the class, including, but not limited to the following:

    (a) Whether a fiduciary relationship existed between the Church Companies and Class and Subclass Members;

    (b) Whether the Church Companies breached a fiduciary duty to Class and Sublcass Members;

  (c) Whether Class and Subclass Members' damages were caused by the breach of fiduciary duty owed to them by the Church Companies;

  (d) Whether Defendants aided and abetted the breach of a fiduciary duty to Class and Subclass Members by the Church Companies;

  (e) Whether the Church Companies intentionally misrepresented or concealed material facts to Class and Subclass Members;

  (f) Whether the Church Companies did so to induce reliance by Class and Subclass Members;

  (g) Whether Class and Subclass Members were justified in relying on the misrepresentations of material facts by the Church Companies;

  (h) Whether Class and Subclass Members' damages were caused by misrepresentation or concealment of material facts;

  (i) Whether PRESTIGE knew of the fraudulent activities of the Church Companies;

  (j) Whether PRESTIGE substantially assisted the fraudulent activities of the Church Companies;

  (k) Whether PRESTIGE committed tortious acts with fraud, oppression or malice;

55. The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of California law. Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

## COUNT I

## Aiding and Abetting Fraud

56. Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

57. The Church Companies intentionally defrauded every investor, including Plaintiffs herein. The Church Companies falsely represented that it invested its investor money and derived a profit, when, in fact, it was a Ponzi scheme with no source of revenue other than sales to investors, and it was not deriving a profit from investment or any other source. The Church Companies failed to disclose material information that its head pastor and president, Whitney, was a felon who was convicted of financial fraud and was just released from prison months before creation of the Church. The Church Companies also failed to disclose that it was not profitable and did not have any source of revenue other than sales to investors.

58. Plaintiffs would not have invested in the Church Companies had they known the truth.

59. Defendant PRESTIGE knew that the Church Companies were engaging in fraud. Nonetheless, Defendant PRESTIGE substantially assisted and aided and abetted the Church Companies by providing accounts into which investors' money could be transferred, providing accounts from which the Church Companies could send fictitious profit checks, providing accounts to insiders into which Church money could be transferred, and lending a general air of legitimacy.

60. As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $25,000,000.

## COUNT II

## Aiding and Abetting Breach of Fiduciary Duty

61. Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

62. The Church Companies were an investment advisor to all of the Plaintiffs. Plaintiffs entrusted their money to the Church Companies. As a result, the Church Companies owed

Plaintiffs, who were their member/clients, fiduciary duties.  The Church Companies breached the fiduciary duties they owed to the Plaintiffs.

63. Defendant PRESTIGE, at all material times, had actual knowledge of the Church Companies' fiduciary duties to Plaintiffs.

64. Defendant PRESTIGE, at all material times, knew that the Church Companies were violating its fiduciary duties to Plaintiffs.

65. Defendant PRESTIGE substantially assisted and aided and abetted the Church Companies by providing accounts into which investors' money could be transferred, providing accounts from which the Church Companies could send fictitious profit checks, providing accounts to insiders into which Church money could be transferred and lending a general air of legitimacy.

66. As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $25,000,000.

## COUNT III

### Violation of California Penal Code §496

### (Against All Defendants)

67. Plaintiffs re-allege and incorporate each and every allegation set forth above.

68. Penal Code §496(c) permits "any" person who has been injured by a violation of section 496(a) to recover three times the amount of actual damages, costs of suit and attorney's fees in a civil suit.  Penal Code §496(a) creates an action against "any" person who (1) receives "any" property that has been stolen or obtained in any manner constituting theft, knowing the property to be stolen or obtained, or (2) conceals, sells, withholds, or aids in concealing or withholding "any" property from the owner, knowing the property to be so stolen or obtained.

69. Under Penal Code § 1.07(a)(38), "person" means "an individual, corporation, or association."  Thus, Defendants may be persons who violate section 496(a).

70. As set forth herein, the investors' funds were stolen or obtained by theft, without limitation, under Penal Code §484, by false or fraudulent representations or pretenses.

71. The Defendants meet the grounds for liability of section 496(a) because they, and each of them:

      a)    knew the funds were stolen or obtained by theft; and, with such knowledge,

      b)    received said funds, by, without limitation: (i) accepting investment deposits from defrauded investors, (ii) providing accounts from which fictitious profit checks could be sent, and/or (iii) providing accounts to the Church Companies principals to which investor money could be transferred.

72. The Defendants violated the second ground for liability of section 496(a) because they, and each of them:

      a)    knew the funds were stolen or obtained by theft; and with such knowledge,

      b)    concealed, withheld, or aided in concealing or withholding said funds from their rightful owner(s) by, without limitation (i) accepting transfers and other payments made by the defrauded investors for deposit into the the Church Companies' accounts at PRESTIGE, (ii) failing to report or disclose the Ponzi scheme activity as required by law and instead assisting it to continue undetected; and/or (iii) allowing the Church Companies to withdraw millions of dollars of funds.

73. As a direct and proximate result of the acts and omissions described above, plaintiffs were injured by the Defendants' violations of section 496(a). Pursuant to California Penal Code §496(c), Plaintiffs seek statutory treble damages, costs of suit, and reasonable attorney's fees.

## COUNT IV

### Assisting Financial Elder Abuse

### (Against All Defendants)

74. The Elder Abuse Plaintiffs re-allege and incorporate each and every allegation set forth above.

75. Under California law, financial elder abuse occurs when a person or entity "[a]ssists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both." *Wel. & Inst. Code* § 15610.30(a)(2). A "wrongful use" occurs when the person "knew or should have known that this conduct is likely to be harmful to the elder or dependent adult." *Id.* at § 15610.30(b). An "elder" is defined an "any

person residing in [California], 65 years of age or older." *Id.* at §15610.27.

76. Through the conduct alleged herein, Defendants assisted the Church Companies in taking, appropriating, and retaining money from the Elder Abuse Plaintiffs, including retirement savings, for a wrongful use or with intent to defraud or both.

77. Defendants knew or should have known that the wrongful conduct was directed to one or more senior citizens or disabled persons and their conduct caused one or more senior citizens or disabled persons to suffer loss or an encumbrance of a primary residence, principal employment, or source of income, substantial loss of property set aside for retirement, or for personal or family care and maintenance; or substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of the senior citizen or disabled person.

78. Each of the Elder Abuse Plaintiffs was substantially more vulnerable than other members of the public to the Defendants' conduct because of their age, and actually suffered substantial physical, emotional, or economic damage resulting from the Defendants' conduct.

79. Pursuant to California's Welfare and Institutions Code, Defendants are liable for reasonable attorneys' fees and costs, including reasonable fees for the service of counsel for the Elder Abuse Plaintiffs expended in connection with the prosecution of this Cause of action for financial elder abuse.

80. As a proximate result of the above conduct of Defendants, as previously alleged, the Elder Abuse Plaintiffs were damaged in an amount to be proven at trial.

81. The aforementioned conduct of Defendants was done with the intention on the part of Defendants of maintaining the Whitney Ponzi scheme and thereby depriving the Elder Abuse Plaintiffs of their money. As such, Defendants acted with recklessness, oppression, fraud or malice in committing financial elder abuse.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs TU LE, GENEVA NGUYEN, and MAI T. LY, on behalf of themselves and members of the class, pray for judgment against Defendants, jointly and severally, as follows:

1. Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiffs TU LE, GENEVA NGUYEN, and MAI T. LY as the representatives of the subclass and class;

2. For aiding and abetting fraud, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $25,000,000, and interest on that amount;

3. For aiding and abetting breach of fiduciary duty, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $25,000,000, and interest on that amount;

4. For violation of Penal Code §496, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek economic damages in an amount to be proven at trial, but believed to exceed $25,000,000, treble damages, costs of suit and attorney's fees,

5. For the Financial Elder Abuse, all Elder Abuse Plaintiffs seek economic damages in an amount to be proven at trial, but believed to exceed $25,000,000, and interest on that amount;

6. For reasonable attorneys' fees and costs of suit as permitted by law;

7. For prejudgment interest as permitted by law;

8. For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: February 18, 2022

**SMN LAW GROUP APC**

By: _____
Steven M. Nuñez, Esq.
*Attorneys for Plaintiffs*